# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| JEANNIE M. MARSHALL,  )  <br>    Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ) <br> MICHAEL J. ASTRUE, ) <br>  **Commissioner of Social Security,** ) <br>    Defendant. ) | Civil Action No. 2:10cv00019 <br> **REPORT AND** <br> **RECOMMENDATION** <br><br> By:   Pamela Meade Sargent <br> United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Jeannie M. Marshall, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003 & Supp. 2010). This court has jurisdiction pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Marshall protectively filed her application[1] for SSI on April 28, 2006, alleging disability as of February 15, 2003, based on pain in her back, neck and joints, depression and hepatitis C. (Record, ("R."), at 94-106, 134-40, 142-48, 177.) The claim was denied initially and upon reconsideration. (R. at 58-60, 63, 64-68.) Marshall then requested a hearing before an administrative law judge, ("ALJ"). (R. at 57.) The ALJ held a hearing on November 28,2007, at which Marshall was not represented by counsel. (R. at 835-43.) The ALJ continued Marshall's hearing to allow her to obtain representation. A second hearing was held on May 1, 2008, at which Marshall was represented. (R. at 844-90.)

By decision dated December 29, 2008, the ALJ denied Marshall's claim. (R. at 11-21.) The ALJ found that Marshall had not engaged in any substantial gainful activity since April 28, 2006. (R. at 13.) The ALJ found that the medical evidence established that Marshall had severe impairments, namely depression, anxiety, borderline intellectual functioning, rheumatoid arthritis, fibromyalgia, fibrocystic breast disease and degenerative disc disease, but he found that Marshall's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13-17.) The

---

[1] Marshall has filed a prior application for SSI, which was denied on July 26, 2005. (R. at 177.)

ALJ also found that Marshall had the residual functional capacity to perform sedentary[2] work that did not require her to stand more than 20 minutes an hour, allowed breaks every two hours and did not require work around heights or dangerous equipment, driving, public contact or more than minimal contact with supervisors and co-workers. (R. at 17-20.) The ALJ found that Marshall had no past relevant work. (R. at 20.) Based on Marshall's age, education, lack of work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Marshall could perform, including jobs as a pharmaceutical assembler, a dresser or a marker. (R. at 20-21.) Thus, the ALJ found that Marshall was not under a disability as defined under the Act and was not eligible for benefits. (R. at 21.) *See* 20 C.F.R. § 416.920(f) (2010).

After the ALJ issued his decision, Marshall pursued her administrative appeals, but the Appeals Council denied her request for review. (R. at 2-4,7.) Marshall then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2010). The case is before this court on Marshall's motion for summary judgment filed October 5, 2010, and the Commissioner's motion for summary judgment filed November 4, 2010.

---

[2] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *See* 20 C.F.R. § 416.967(a) (2010).

*II. Analysis*

Marshall argues that substantial evidence does not support the ALJ's decision regarding her residual functional capacity. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 12-19.) Based on my review of the record, I agree that substantial evidence does not support the ALJ's decision regarding Marshall's mental residual functional capacity, and I recommend that the court vacate the Commissioner's decision denying benefits and remand Marshall's claim to the Commissioner for further development.

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2010); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2010).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist

in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2010); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

The ALJ found that Marshall had the residual functional capacity to perform sedentary work that did not require her to stand more than 20 minutes an hour, allowed breaks every two hours and did not require work around heights or dangerous equipment, driving, public contact or more than minimal contact with supervisors and co-workers. Thus, the only limitations the ALJ placed on Marshall's residual functional capacity as a result of her mental impairment was that she not have public contact or more than minimal contact with supervisors and co-workers. The uncontradicted evidence contained in the record, however, shows that Marshall's mental impairments had a greater impact on her work-related duties than found by the ALJ.

In particular, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, performed a consultative psychological examination of Marshall on August 22, 2006, at the state agency's request. (R. at 411-17.) Marshall told Lanthorn that she suffered from depression and "nerves." (R. at 411.) She stated that when she was nine years old, her father killed himself in front of her. (R. at 412.) She stated that she quit school at the age of 15 after being retained in the eighth grade twice. (R. at 412.) She stated that she also was retained in the third grade. (R. at 412.)

Marshall told Lanthorn that she had been married twice. (R. at 413.) Her first marriage lasted 12 years. (R. at 413.) Marshall said that she had three children from that marriage, all of whom were no longer in her custody. (R. at 413.) Marshall stated that she had been married to her second husband for the previous two years. (R. at 413.) Marshall told Lanthorn that she had been raped twice as a child and twice as an adult. (R. at 413.) She stated that she had attempted suicide on one occasion by cutting her wrists. (R. at 413.) Marshall also stated that she started using illicit drugs at the age of 15 and continued until she married her second husband. (R. at 413.) Marshall said she had used marijuana, Lortab, Percocet, Xanax and cocaine and had injected OxyContin. (R. at 413.)

Lanthorn stated that Marshall showed no signs of ongoing psychotic process or delusional thinking. (R. at 414.) Marshall spoke in a monotone voice, and her affect was flat. (R. at 414.) Lanthorn noted that she appeared somewhat depressed. (R. at 414.) Marshall reported that she often felt nervous like "her nerves are stretched like a rubber band." (R. at 414-15.)

Lanthorn administered the Weschler Adult Intelligence Scale–Third Edition, ("WAIS-III"), on which Marshall achieved a verbal IQ score of 87, a performance IQ score of 75 and a full-scale IQ score of 79, placing her in the borderline range of intellectual functioning. (R. at 415.) Lanthorn stated that the difference between her verbal and performance IQ scores suggested the presence of anxiety, tension and probable depression. (R. at 415.) Lanthorn diagnosed Marshall as suffering from polysubstance dependence in early full remission, major depressive disorder, recurrent, moderate, anxiety disorder, not otherwise specified, borderline intellectual functioning and personality disorder, not otherwise specified. (R. at 416.) Lanthorn placed Marshall's then-current Global Assessment of Functioning, ("GAF")[3], score at 61.[4] (R. at 416.)

Lanthorn stated that Marshall's prognosis was between fair and guarded, and he recommended that she be seen at a local mental health center for psychological and psychiatric evaluation and treatment. (R. at 416.) Lanthorn noted, "From a psychological point of view, … Marshall is possibly capable of performing a 40-hour workweek particularly in simple and repetitive tasks." (R. at 417.)

Louis A. Perrott, Ph.D., a state agency psychologist, reviewed Marshall's medical records on September 9, 2006, and agreed that Marshall suffered from major depressive disorder (recurrent), borderline intellectual functioning, anxiety

---

[3] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[4] A GAF of 61-70 indicates that the individual has "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... , but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

disorder, personality disorder and polysubstance dependence in early remission. (R. at 349-62.) Perrot completed a Psychiatric Review Technique form, ("PTRF"), which stated that Marshall suffered from moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace. (R. at 359.) He also stated that Marshall had suffered from one or two repeated episodes of decompensation, each of extended duration. (R. at 359.) Perrott stated that he agreed that Marshall should be "capable of performing simple work on a sustained basis." (R. at 361.) Perrott also completed a Mental Residual Functional Capacity Assessment on which he stated that Marshall was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instruction and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (R. at 363-64.)

E. Hugh Tenison, Ph.D., another state agency psychologist, reviewed and agreed with the opinions expressed by Perrott on the PRTF and the assessment on February 9, 2007. (R. at 349, 365.)

The record shows that Marshall treated with Carrie Hawkins, a social worker with Dickenson County Behavioral Health Sciences, beginning March 31, 2008. (R. at 322.) At her initial interview on March 31, 2008, Marshall told Hawkins that she had an extremely dysfunctional childhood. (R. at 321.) She also stated that she suffered from a history of anxiety and depression with suicide attempts. (R. at 321.) Hawkins diagnosed Marshall as suffering from generalized anxiety disorder, depressive disorder, not otherwise specified, and partner relational problems. (R. at 321.) Hawkins placed Marshall's GAF score at 48[5] with the highest within the past year being 55.[6] (R. at 321.) Hawkins stated that one of Marshall's individual needs and preferences was to "obtain disability." (R. at 321.) Hawkins noted that Marshall reported difficulty being around people and had poor coping skills. (R. at 322.)

On April 14, 2008, Hawkins completed a Medical Assessment of Plaintiff's Ability To Do Work-Related Activities (Mental) form. (R. at 284-85.) Hawkins stated that Marshall had a limited, but satisfactory, ability to understand, remember and carry out simple job instructions. (R. at 285.) Hawkins also stated that Marshall's ability in the following areas was seriously limited, but not precluded: to follow work rules, to maintain attention and concentration, to understand, remember and carry out detailed, but not complex, instructions and to maintain personal appearance. (R. at 284-85.) Hawkins stated that Marshall had no ability

---

[5] A GAF of 41-50 indicates "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

[6] A GAF of 51-60 indicates "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

to perform all other occupational, performance and personal-social adjustments. (R. at 284-85.)

Wade Smith, M.S., a licensed senior psychological examiner, completed a consultative examination of Marshall at the Commissioner's request on July 8, 2008. (R. at 228-33.) Marshall told Smith that "[p]eople scare me." (R. at 228.) Marshall stated that her father would beat her mother when she was young and that, as a child, she ate only at school because her parents would not allow her to eat at home. (R. at 228.) Marshall told Smith that she had suffered a number of traumatic events in her life, including witnessing the suicide of her father when she was age nine, being kidnapped and raped as a child and being raped twice as an adult. (R. at 228.) Marshall also report being threatened at gunpoint recently by a neighbor's boyfriend. (R. at 231.)

Marshall reported that she left school at age 15 after being retained in the eighth grade for the third year. (R. at 229.) She stated that she did not attend special education classes, but that she was retained in the third grade as well. (R. at 229.) Marshall stated that she made Ds and Fs in school and was suspended 10 to 15 times. (R. at 229.) Marshall also stated that she had attempted to obtain her general equivalency development, ("GED"), diploma on three occasions, but had failed the test on each attempt. (R. at 229.)

Marshall told Smith that she had sought psychological treatment with Dickenson County Behavioral Health Center intermittently since 1983. (R. at 229.) Marshall admitted that she had regularly used marijuana from age 13 to about 30 and abused opiates and benzodiazepines from age 26 to 27. (R. at 229.) Marshall

estimated that she had attempted to commit suicide on five or six occasions. (R. at 229.)

Smith stated that Marshall's mood was depressed, and her affect was flat. (R. at 230.) Marshall was alert and oriented with intact concentration. (R. at 230.) Smith estimated Marshall's intelligence was in the borderline to low average range. (R. at 230.) Smith stated that he did not believe that Marshall was exaggerating her symptoms. (R. at 231.) Smith stated that Marshall's symptoms were consistent with post-traumatic stress disorder. (R. at 231.) Marshall reported a persistent sense of fear and helplessness. (R. at 231.)

Smith diagnosed Marshall as suffering from post-traumatic stress disorder and depressive disorder, not otherwise specified. (R. at 233.) Smith placed Marshall's then-current GAF score at 55. (R. at 233.) Smith stated, "She seems to be mildly limited in her ability to understand and remember general items and concepts, but it is reasonable to expect that she should be able to comprehend and follow both simple and somewhat detailed job instructions…. Her concentration and persistence appear moderately impaired by her psychiatric issues, but are probably adequate to meet the demands of simple or somewhat detailed work-related decisions. She shows a markedly impaired ability to interact with others because of her PTSD features. … Her physical and psychiatric problems may detract from her ability to maintain attendance and meet an employment schedule." (R. at 232.)

Smith also completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental) for Marshall on July 18, 2008. (R. at 234-36.) On this

assessment, Smith stated that Marshall had a seriously limited ability to interact with others and to interact appropriately with co-workers. (R. at 235.) Smith stated that Marshall had more than a slight limitation, but was able to function satisfactorily, in the areas of understanding, remembering and carrying out complex job instructions, making judgments on complex work-related decisions and interacting appropriately with supervisors. (R. at 234-35.) Nevertheless, Smith also stated, "Comprehension of complex material is likely limited by innate intellectual ability." (R. at 234.) Smith stated that Marshall had either no limitation or only a slight limitation in her ability to understand, remember and carry out simple job instructions, in her ability to make judgments on simple work-related decisions and in her ability to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 234-35.) Smith also stated, "Her apparent inability to maintain working relationships with others is seen as an element of her PTSD. When she is frustrated, she feels emotionally overwhelmed and tends to withdraw or overreact." (R. at 235.)

Thus, the uncontradicted psychological evidence shows that Marshall was limited to simple work. The ALJ, however, included no such restriction in his residual functional capacity findings. In reaching his conclusion, the ALJ stated that he was assigning little weight to the opinions of Marshall's counselor, Hawkins. (R. at 19.) While the ALJ may have been justified in disregarding Hawkins's restrictive assessment, he is not free to simply disregard uncontradicted expert opinions in favor of his own opinion on a subject that he is not qualified to render. *See Young v. Bowen*, 858 F.2d 951, 956 (4th Cir. 1988); *Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir. 1984).

Based on the above, I find that substantial evidence does not exist to support the ALJ's finding regarding Marshall's mental residual functional capacity, and I will recommend that the court remand Marshall's claim to the Commissioner for further consideration.

Marshall also argues that substantial evidence does not exist in the record to support the ALJ's finding as to her physical residual functional capacity. The ALJ found that Marshall was capable of performing sedentary work that did not require her to stand more than 20 minutes an hour, allowed breaks every two hours and did not require work around heights or dangerous equipment or driving motor vehicles. (R. at 17.) This finding is supported by an overwhelming weight of medical evidence. Dr. Kevin Blackwell, D.O., performed a consultative examination on August 31, 2006, and stated that based on his findings, Marshall could maximally lift items weighing up to 50 pounds and frequently lift items weighing up to 20 pounds. (R. at 429-32.) He also stated that Marshall could stand and sit for up to eight hours in an eight-hour shift. (R. at 431.) On September 21, 2006, based on his review of the medical evidence, Dr. Shirish Shahane, M.D., a state agency physician, found that Marshall could perform medium work.[7] (R. at 341-48.) This assessment was reviewed and affirmed by Dr. Richard M. Surrusco, M.D., another state agency physician. (R. at 345.) Marshall also underwent a post-hearing consultative examination by Dr. Ravi Titha, M.D., on June 18, 2008. (R. at 237-41.) Dr. Titha stated that Marshall could occasionally lift and carry items weighing up to 20 pounds with the right hand and up to 10 pounds with the left hand, and could sit, stand and walk for up to a total of four hours each in an eight-hour

---

[7] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If an individual can do medium work, that person also can perform sedentary and light work. *See* 20 C.F.R. § 416.967(c) (2010).

workday with normal breaks. (R. at 241-43.) Dr. Titha also stated that Marshall could walk and stand for up to two hours without interruption and could sit for up to one hour without interruption. (R. at 243.)

Marshall treated with Dr. James C. Senter, M.D., from April 8, 2002, to May 8, 2006. (R. at 448-62, 586-649.) There are no indications that Dr. Senter ever placed any restrictions on Marshall's work-related abilities. Furthermore, Dr. Dominic Pamintuan, M.D., and Dr. Samina Yousuf, M.D., and their physician assistants treated Marshall from June 20, 2008, through February 27, 2009. (R. at 210-27, 765-68, 771-805.) These providers placed no restrictions on Marshall's activities. X-rays taken of Marshall's lumbar spine on May 20, 2008, showed no abnormality. (R. at 209.) X-rays of Marshall's thoracic spine taken on July 25, 2008, showed some degenerative disc disease, but only at the T9-10 level. (R. at 824.) Lumbar, thoracic and cervical MRIs performed on August 26, 2008, showed some degenerative disc disease, but no disc protrusion with neural impingement at any level. (R. at 820-22.) Dr. Michael W. Bible, M.D., a rheumatologist, saw Marshall on November 26, 2008. (R. at 670-73.) Dr. Bible found some evidence of mild osteoarthritis in Marshall's hands, but no evidence of rheumatoid arthritis. (R. at 670.) Dr. Bible also stated, "There is no evidence of any musculoskeletal abnormality that would limit her in any physical way." (R. at 670.)

The only medical evidence contained in the file contradicting the ALJ's finding as to Marshall's physical residual functional capacity is from Dan Levesque, D.C., a chiropractor. Based on a March 3, 2008, examination, Levesque stated that Marshall could stand for no more that 10 to 15 minutes at a time and could not sit for longer than 30 minutes at a time. (R. at 286-98.) He also stated

that Marshall could not hold or carry anything weighing more than 15 pounds. (R. at 297.) Levesque based his findings on spinal x-rays which he said showed moderate to advanced spondylosis. (R. at 296.) Levesque also stated that there was nerve impingement at the T3-5, T12-L3 and L5-S1 levels. (R. at 297.)

The ALJ rejected Levesque's opinions because they were inconsistent with the objective diagnostic reports and treating and examining physicians' reports. The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 416.927(d)(2) (2010). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings. In this case, the ALJ's rejection of Levesque's opinions and his finding with regard to

Marshall's physical residual functional capacity are supported by substantial evidence.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does not exist in the record to support the ALJ's finding regarding Marshall's mental residual functional capacity;

2. Substantial evidence exists in the record to support the ALJ's weighing of the medical evidence;

3. Substantial evidence exists in the record to support the ALJ's finding regarding Marshall's physical residual functional capacity; and

4. Substantial evidence does not exist in the record to support the ALJ's finding that Marshall was not disabled under the Act.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Marshall's and the Commissioner's motions for summary judgment, vacate the Commissioner's decision denying benefits and remand the case to the Commissioner for further development.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2010):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED: January 28, 2011.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE